APPEAL OF JOHN A. WARD, EXECUTOR, ESTATE OF GEORGE DRUMMET.

Docket No. 5202. Submitted December 11, 1925. Decided February 18, 1926.

Leon F. Cooper, Esq., for the taxpayer.
J. Sterling Halstead, Esq., for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This is an appeal from the determination of a deficiency in estate tax in the amount of $4,576.63, arising from the inclusion by the Commissioner in the gross estate of the value of certain real estate transferred by the decedent to his children in May, 1922, one year prior to his death, upon the ground that the transfer was made in contemplation of death.

### FINDINGS OF FACT.

John A. Ward is the duly qualified and acting executor of the estate of George Drummet, who died of cancer on April 30, 1923, at the age of 61 years. For several years prior to his death the decedent was the owner of approximately 1,500 acres of farm land at Prophetstown, Ill. At the age of about 23 years he was affected by a slight lameness in his left leg which increased, necessitating the use of a cane, and for several years prior to his death he was compelled to use a crutch. About 1917 he suffered considerable pain in his knee and hip, and sought medical treatment through local physicians. Instead, however, of obtaining relief, the pain grew more severe, as a result of which he went to the Presbyterian Hospital, at Chicago, on April 23, 1918, where X-ray pictures were taken and a diagnosis made showing a peculiar tumor of the pelvic bone, or ilium, and a peculiar destructive cystic disease of the bone. The attending surgeon at the hospital made an exploratory operation. The tumor was so extremely vascular and contained so many blood vessels that a hemorrhage followed the incision. No portion of the tumor, therefore, could be obtained for microscopic examination. Although it was the opinion of the surgeon that the decedent was suffering from cancer, this fact was not proved to his entire satisfaction, due to his inability to obtain a portion of the tumor for microscopic examination. As a result, the decedent was informed that he had a bloody tumor and a cystic disease of the bone, and that he might recover through X-ray treatments and injections of Coley's toxin. Accordingly, he was treated with X-ray and given injections until about September of that year. Upon his return home, the attending surgeon arranged with the

decedent's local physician to administer the X-ray treatments and the injections of toxin regularly, and this was continued until the decedent's death.

During 1919 the decedent considered the matter of transferring his property to his children, on condition that he might at any time cancel the transfer and take back the property, and consulted an attorney relative thereto. However, nothing further was done in regard to the matter until during or shortly prior to November, 1921.

He returned to the hospital from time to time until November, 1921, for further examinations, advice, and treatments, remaining there each time approximately two or three weeks. Although the X-ray photographs showed a continued destruction of the hip bone, there was an indication at times that the destructive process was being retarded, causing the hospital physician to entertain hope that the decedent was affected with a cystic disease of the bone instead of a cancer. This hope, however, was slight, and the opinion that the decedent was suffering with cancer was not abandoned.

On his last visit to the hospital, in November, 1921, the decedent was suffering considerable pain and had difficulty in moving his left leg. He was kept advised that X-ray plates showed a continued destruction of the bones of the hip. The X-ray plate made about the 1st of November, 1921, showed "marked destruction of half of ilium, all of ischium, and particular portions of both shanin of pubis." The report of the physician on this plate was that the destructive process was far more extensive than on the previous plates and that there was considerable atrophy from disuse, particularly of the left femur. Upon his return home, the decedent, in conversations with friends who called to see him, discussed his condition, informing his brother-in-law, in particular, of what the last X-ray photograph showed and of what he had been informed by those who had attended him at the hospital. On cross examination this witness stated that the decedent informed him that the X-ray showed that half of his hip bone had been eaten away. Decedent made other statements, also, concerning his condition and the nature of his trouble, the details of which, however, the witness could not remember.

About the time of, or shortly after, his first visit to the hospital in Chicago, the decedent went to Mayo Bros.' Hospital, at Rochester, Minn., for examination and treatment. On that visit his trouble was found to be in the hip. Upon his return home he informed those about him that the physicians who examined him at Mayo Bros.' Hospital had advised him that he might just as well go home, as his local physician could doctor him just as well. On his various visits to the hospitals the decedent was accompanied by his wife.

It had been the decedent's custom for about five or six years prior to his death to spend his winters in Florida or California. On such trips he was treated by local physicians.

During or shortly prior to November, 1921, the decedent consulted an attorney relative to the preparation of deeds for the transfer of his property to his children, reserving to himself and his wife, and to the survivor, an annuity of $8,000, and informed the attorney that he was unable longer to look after the property and that it was his desire to spend the entire winter months in Florida, or such other place as he might desire to go. About this time, or just prior to his conference with the attorney relative to the deeds of transfer, the decedent selected five of his neighbors to go with him over his farm lands for the purpose of allocating the same to his children. Thereafter, he went to Florida, where he remained until about May, 1922. During his stay in Florida, he consulted a local physician who had not theretofore treated him. This physician informed him that he was suffering from sarcoma and tuberculosis of the bone. Upon his return home, the decedent formally executed and acknowledged the deeds of transfer of property to his children on June 3, 1922. Seven parcels of real estate were transferred, and an annuity of $2,000 each, as to four of the parcels, was reserved to himself and wife jointly during their lives. The executor included as a part of the gross estate the capitalized value of the annuity of $8,000 at $160,000, as to which there is no controversy.

The decedent's condition grew steadily worse until his death on April 30, 1923.

The transfers in question were made in contemplation of death.

### DECISION.

The determination of the Commissioner is approved.

---

APPEAL OF EMILIE BAER AND MARK HYMAN, AS EXECUTORS AND TRUSTEES UNDER THE WILL OF MORRIS B. BAER, DECEASED.

Docket No. 3532. Submitted August 10, 1925. Decided February 18, 1926.

Value of real estate for estate-tax purposes determined.

*Charles E. Scribner, Esq.*, for the taxpayer.
*Frank T. Horner, Esq.*, for the Commissioner.

Before JAMES, LITTLETON, SMITH, and TRUSSELL.

This appeal is from the determination of a deficiency in estate tax in the amount of $13,213.91, arising from an increase by the